**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

NORMAN B. ISKOW,

          CASE NO. 15-14415
   *Plaintiff*,     DISTRICT JUDGE STEPHEN J. MURPHY, III
*v.*         MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

   *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (Docs. 9, 13)**

**I.  RECOMMENDATION**

   In light of the entire record in this case, I suggest that substantial evidence does

not support the Commissioner's determination that Iskow is not disabled. Accordingly,

**IT IS RECOMMENDED** that Iskow's Motion for Summary Judgment (Doc. 9) be

**GRANTED**, the Commissioner's Motion (Doc. 13) be **DENIED**, and that this case be

**REMANDED FOR FURTHER PROCEEDINGS** pursuant  to sentence four of 42

U.S.C. § 405(g).

**II.  REPORT**

   **A.  Introduction and Procedural History**

   Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

Reference, this case was referred to the undersigned magistrate judge for the purpose of

reviewing a final decision by the Commissioner of Social Security ("Commissioner")

denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42

U.S.C. § 1381 *et seq*. (Doc. 3; Tr. 1-5). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 13).

Plaintiff Norman Iskow was fifty years old as of September 18, 2014, the date of the ALJ's decision. (Tr. 24, 142). His application for benefits was initially denied on February 21, 2013. (Tr. 81). Iskow requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Ena Weathers on July 18, 2014. (Tr. 29-64). Iskow, represented by attorney Robert MacDonald, testified, as did vocational expert ("VE") Zachary Matthews. (*Id*.). On September 18, 2014, the ALJ issued a written decision in which she found Iskow not disabled. (Tr. 12-24). On December 4, 2015, the Appeals Council denied review. (Tr. 1-4). Iskow filed for judicial review of that final decision on December 22, 2015. (Doc. 1).

### B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

3

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual

4

functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least 18 years old and has a disability that began before age 22 (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Iskow not disabled under the Act. (Tr. 24). The ALJ found at Step One that Iskow had not engaged in substantial gainful activity following the alleged onset date, August 27, 2012. (Tr. 17). At Step Two, the ALJ concluded that Iskow had the following severe impairments: "obesity; dipolar [sic] disorder; panic disorder with shortness of breath; post-traumatic stress disorder (PTSD); anxiety, [not otherwise specified]; lumbar degenerative disc disease with radiculopathy; cervical degenerative disease with radiculopathy; hepatomegaly with diffuse fatty infiltration of the liver; and sinus tachycardia." (Tr. 17). At Step Three, the ALJ found that Iskow's combination of impairments did not meet or equal one of the

5

listed impairments. (Tr. 18). The ALJ then found that Iskow had the residual functional capacity ("RFC") to perform light work, except with additional limitations as follows:

> [U]nable to climb ladders, ropes, or scaffolds; can occasionally stoop, crouch, crawl, climb ramps and stairs; can occasionally overhead reach bilaterally; must avoid concentrated exposure to extreme cold, fumes, and pollutants; can perform simple routine tasks without strict production demands; is able to have occasional interaction with coworkers and the general public; occasionally push and pull with the lower extremity, especially on the left; frequent fine fingering bilaterally; an ability to use a cane for ambulation on uneven surfaces; and, an ability to change from standing to seated position or vice versa for 1-2 minutes every hour to two hours without interference with work product.

(Tr. 19). At Step Four, the ALJ found that Iskow could not return to any past relevant work. (Tr. 23). At Step Five, the ALJ concluded that Iskow retained the ability to perform work which exists in significant numbers in the national economy. (Tr. 23).

### E.   Administrative Record

#### 1.   Medical Evidence

The Court has thoroughly reviewed Iskow's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.   Application Reports and Administrative Hearing

##### a.   Iskow's Function Report

Iskow completed a function report on January 4, 2013, in which he asserted that he was unable to perform work "due to both physical and mental illnesses;" he reported problems standing at length and performing repetitive motions; likewise he asserted that

he could not "function in a work environment" due to his mental limitations, including problems with anger outbursts and getting along with authority figures. (Tr. 230). Iskow spent his days at the library, writing in his journal at home for about two hours, laying on his bed, browsing the internet, cooking, taking medication, and sleeping. (Tr. 231-32). However, he reported difficulty sleeping, and "often . . . will succumb to exhaustion rather than sleep." (Tr. 232). He had difficulty standing long enough to prepare food, which took thirty to forty minutes, and sometimes forewent preparing food because he is "in constant pain." (Tr. 233). He could not perform outdoor chores, and could "barely keep [his] room clean." (*Id.*).

Iskow did not go outdoors every day due to "pain or depression or [his] PTSD." (Tr. 234). He could drive, and went out alone. (*Id.*). He shopped in stores for necessary items like food, and did so twice monthly for about three hours per trip. (*Id.*). He had no mental limitations preventing him from handling money or accounts. (Tr. 234).

Iskow's hobbies included writing poetry, and writing and listening to music; he no longer fished, swam, or hunted due to his limitations. (Tr. 235). He did not spend time with others outside of visiting the library, church, and grocery store. (*Id.*). He had difficulty getting along with "people in a position of authority" and had a "standard relationship with certain family members and friends." (Tr. 236). He "no longer enjoy[ed] the company of others" except for his children, and felt "like a hermit." (*Id.*).

7

Iskow checked boxes indicating the he had difficulty with all listed exertional and mental activities, but did not have difficulty talking, hearing, or seeing. (Tr. 236). He could lift only five pounds and had "a hard time lifting laundry detergent or cases of bottles or cans." (*Id.*). He could squat "but it causes pain," and "cannot bend over anymore," could not kneel, and not climb stairs. (*Id.*). He could "only stand now for about three h[ou]rs," could walk about thirty yards, sit for ten minutes, and experienced pain when reaching. (*Id.*). He could pay attention for "about five minutes," and did not follow instructions "very well." (*Id.*). Iskow wrote that his pain affected his ability to concentrate, and later wrote that he would lose concentration "after 10 minutes." (Tr. 237). He complained of difficulty grasping due to carpal tunnel syndrome, such that small and slick objects would sometimes fall out of his hands. (*Id.*).

Iskow wrote that he previously lost jobs due to his temper, and had difficulty sustaining stress or changes. (Tr. 238). He reported "social anxiety" and a "need to be in control." (*Id.*). He used a cane "every day," but did not write that said device prescribed by a physician. (*Id.*). Finally, Iskow wrote that he briefly obtained a job a K-Mart, but found himself unable to train or work due to his PTSD, back pain, and other ailments, and thus lost that position. (Tr. 239).

### b.   Iskow's Testimony at the Administrative Hearing

At the July 18, 2014, hearing before the ALJ, Iskow testified that he lived with his girlfriend and her children. (Tr. 31). He weighed 236 pounds and stood five foot ten. (Tr.

8

35-36). He drove about twice weekly, once to the store and once to church. (Tr. 37). He had a bachelor's degree. (*Id*.). When asked why he was unable to work, Iskow asserted that he has "so many appointments all the time, and also mentally, emotionally I just can't handle stress anymore . . . . [a]nd I cannot sit for a long period of time . . . can't stand for a long period of time." (Tr. 40). He could sit for around two hours at a time, and stand for around an hour. (*Id*.). He did not believe he could return to sedentary work because he "get[s] easily agitated" and did not "handle stress that well anymore." (Tr. 47). He quit working as a car salesman because it was "a high stress job," and he "couldn't do it anymore mentally" because of "high stress" associated with customers and sales quotas. (Tr. 47). Likewise, he quit working as a collections agent because of family stress, quotas, and the necessity that he move "up and down with [his] back." (Tr. 47-48). He could no longer perform sales work "because of . . . panic attacks and anxiety." (Tr. 48).

Iskow asserted that he experienced a dull pain throughout his spine, a sharp pain in the lower back through the left foot, and numbness in both lower extremities. (Tr. 42). He reported being in pain at a rate of ten out of ten, where ten represents a trip to the emergency room, because he had been "in and out of the hospital all week." (*Id*.). This pain persisted despite the use of pain medication. (*Id*.). His medication took "a little bit of the edge off" the pain. (Tr. 43). Pain relieving injections helped for around three weeks to a month. (*Id*.).

9

Iskow stated that he could lift "not more than probably four pounds," but also candidly asserted that he could lift a gallon of milk. (Tr. 43). He could also lift "a thing of soda," though it is unclear whether a "thing" was meant to refer to a can, liter, case, or some other amount. (Tr. 44).

Iskow spent his days on the computer, writing poetry, reading, and napping in the afternoon. (Tr. 44). He had no difficulty performing personal care, and could grocery shop on his own. (Tr. 44-45). He took care not to overload bags so that he did not stress his back. (Tr. 45).

Iskow attended church weekly for three hours at a time, and was able to pay attention to the service "sometimes," but other times experienced difficulty concentrating due to his pain. (Tr. 45). He also reported "anger issues from [his] mental illness." (*Id.*). He left church during services about four times in the three months prior. (*Id.*).

Iskow experienced panic attacks "just about every day," which caused difficult breathing and thinking, caused him to cry, caused his heart to race, and made him feel fearful. (Tr. 49). When asked how he deals with such attacks, Iskow stated that he "tr[ies] to find an emergency room," and "tr[ies] to ride it out." (*Id.*). These episodes left him feeling fatigued emotionally and physically. (*Id.*). Iskow clarified that he did not visit the emergency room for treatment of every panic attack, but sought hospital treatment twice in the recent past for panic and anxiety. (Tr. 51). A heart catheterization was performed on one occasion, and his heart was recorded beating 300 times per minute. (*Id.*).

10

Iskow experienced shortness of breath "on a daily basis." (Tr. 51). Despite tightness in his chest, he was able to swim twice weekly, but had to "work through" his shortness of breath. (Tr. 52). However, he had reduced the regularity of his swimming sessions since April of that year. (*Id.*). He then clarified that "cannot swim because of the pain in [his] lower back," but then re-clarified that he could "handle that for about 10, 15 minutes." (*Id.*).

Iskow complained of social anxiety disorder which limited his ability to spend time in public. (Tr. 52). He had some difficulty getting to sleep, and used a breathing machine to reduce the effects of sleep apnea. (Tr. 53). In response to questioning from his attorney, Iskow asserted that he got four to five hours of sleep nightly (Tr. 56), though upon questioning by the ALJ, he reported that he got on "average about five to six hours, sometimes longer" (Tr. 44).

Iskow also alleged that he suffered from numbness on his left upper extremity. (Tr. 53-54). He asserted that holding a cell phone caused his hand to become numb after three to four minutes. (Tr. 54). He had difficulty reaching because that act "affect[ed his] lower spine and [his] mid-back." (Tr. 55). He experienced pain, numbness, and severe muscle tightness in the upper back. (Tr. 56). However, his most severe pain was in his lower back and left leg. (*Id.*).

11

### c. The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Iskow's ability to perform work. (Tr. 56). The ALJ asked several questions regarding Iskow's past work, but these questions are not relevant as the ALJ found that Iskow was unable to perform any past work, and thus based her unfavorable decision on Iskow's ability to complete other work available in the national economy. (Tr. 56-58).

The ALJ asked the VE to assume a hypothetical individual with Iskow's age, education, and work experience, and who could perform light work, but who was further limited as follows: unable to climb ladders, ropes or scaffolds; can occasionally stoop, crouch, crawl and climb ramps and stairs; can occasionally overhead reach bilaterally; must avoid concentrated exposure to extreme cold, fumes and pollutants; can perform simple, routine tasks without strict production demands; with occasional interaction with coworkers and the general public. (Tr. 58-59). The VE found that such a worker could perform work available in the national economy, including the positions of office helper (86,000 jobs nationally), order caller (179,000 jobs), and storage facility clerk (55,000 jobs). (Tr. 59).

The ALJ then posed a second hypothetical, wherein the worker would be limited as in the first hypothetical, but with additional limitations to "occasional push and pull with the lower extremity, especially on the left; frequent fine fingering bilaterally; the ability to change from a standing to a seated position or vice versa for one to two minutes

12

every hour to two hours without interference with work products; and the ability to use a cane for ambulation on uneven surfaces." (Tr. 59-60). The VE found that a so-limited individual would be able to perform the same jobs identified in response to the first hypothetical. (Tr. 60).

In a third hypothetical, the ALJ added that the worker would be off task twenty-five percent of the workday. (Tr. 60). As expected, the VE found that such a limitation would be work-preclusive. (*Id*.).

Iskow's attorney then noted that the jobs identified were in the "light" category of work, and asked whether those positions would require the worker to "be on their feet six hours in an eight-hour day." (Tr. 61). The VE noted that these particular positions would "generally be [performed] sitting." (*Id*.). The VE also confirmed that these positions would require lifting ten pounds frequently and twenty pounds occasionally. (*Id*.). Likewise, an employee who napped for an hour during the day would be unable to perform competitive work. (*Id*.). All of the positions would require frequent handling and fingering. (Tr. 62).

### F.    Governing Law

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the

13

> claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual

findings precluded by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning the latter period, her decision still applies to that period absent the requisite proof. Thus, as applied in this Circuit, the SSR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth

Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir.

16

2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

The Court notes that Iskow previously applied for benefits and was denied. (Tr. 183, 180-92). The ALJ in this case found that he was bound to accept the prior decision

unless new and material evidence was presented; finding such evidence, ALJ Kramzyk did not adopt the findings of that prior decision. (Tr. 113). Neither party argues that the ALJ erred in refusing to adopt the prior ALJ's decision, thus this Court need not further analyze that decision.

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner,

such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a

19

person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Iskow v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's

20

credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Iskow v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective

21

evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i)    [D]aily activities;
> (ii)   The location, duration, frequency, and intensity of . . . pain;
> (iii)  Precipitating and aggravating factors;
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

22

### G.    Analysis

Iskow argues that the ALJ erred in four ways, each of which should merit remand. (Doc. 9 at 19-28). These arguments will be addressed in turn.

### 1.    The ALJ Did Not Err in Assessing Iskow's Ability to Walk

In his first argument, Iskow asserts that the ALJ erred by crafting an RFC which does not fully encompass his supportable limitations. (Doc. 9 at 19-23). Iskow asserts that the ALJ's RFC limits him to work requiring "standing or walking 6 hours of an 8 hour day," but permits him to "rest a couple minutes every hour or two." (Doc. 9 at 19). This appears to be a misinterpretation of the ALJ's RFC for two separate reasons.

First, the ALJs' RFC provides that Iskow can "change from standing to seated position or vice versa for 1-2 minutes every hour to two hours without interference with work product." (Tr. 19). Iskow interprets this provision to give him a one to two minute break from work every one to two hours. (Doc. 9 at 19). While the ALJ's language could unquestionably be clearer, I find that this provision is more readily interpreted as providing Iskow with one to two minutes to shift from the standing to seated position (or vice versa). This is to say that the ALJ's restriction provides Iskow with a sit-stand option, which appears frequently in Social Security cases, rather than with a short unscheduled break. This restriction accommodates Iskow's asserted inability to sit for more than two hours or stand for more than one hour (Tr. 40), whereas no specific testimony or medical evidence supports a need for one to two minute breaks every few

23

hours. Therefore, insofar as Iskow might be interpreted to argue that the ALJ's RFC insufficiently accommodates for his need to alternate between sitting and standing, the ALJ's decision appropriately reflects that need.

Second, Iskow unaccountably concludes that the positions identified by the VE would require him to walk or stand for six out of eight hours in the workday. (Doc. 9 at 19). In reality, as specifically discussed by the VE at the hearing, the positions of office helper, order caller, and storage facility clerk are performed "generally . . . sitting." (Tr. 61). While the undifferentiated "light" category of jobs generally requires walking or standing for six of eight hours in the workday, these specific positions do not. Indeed, Iskow's attorney himself identified the reason why these jobs are in the light category: because they require "lift[ing] up to 20 pounds occasionally." (Tr. 61). Given that the jobs identified by the VE do not require walking for six out of eight hours, Iskow's argument that he is incapable of walking to that degree cannot provide relief. *See Conroy v. Comm'r of Soc. Sec. Admin.*, No. 5:15CV1789, 2016 WL 3971305, at *10 (N.D. Ohio July 25, 2016) ("Regardless, any error on the part of the ALJ with respect to Conroy's ability to climb stairs, crawl and kneel is harmless because the jobs identified by the VE do not require climbing, crawling or kneeling."); *Salter v. Comm'r of Soc. Sec.*, 2015 WL 1880393, at *9 (N.D. Ohio Apr. 24, 2015) (failure of the ALJ to address and include environmental restrictions in an RFC was harmless when the jobs did not require exposure to such hazards); *Isaacs v. Colvin*, No. 1:12-CV-777, 2013 WL 6230352, at *8

24

(S.D. Ohio Dec. 2, 2013) (same) (report and recommendation adopted sub nom. Isaacs v. Comm'r of Soc. Sec., No. 1:12CV777, 2014 WL 1271030 (S.D. Ohio Mar. 27, 2014).

Insofar as Iskow might be interpreted to argue that the ALJ's RFC nevertheless exceeds his capacity to walk, that argument likewise fails. The Dictionary of Occupational Titles listings for order caller, storage-facility clerk, and office helper make no mention of walking whatsoever. *See* 295.367-026 STORAGE-FACILITY RENTAL CLERK, 239.567-010 OFFICE HELPER, 209.667-014 ORDER CALLER. While these positions doubtlessly involve some degree of walking, the ALJ reasonably relied upon the findings of consultative physician Dr. Dale Blum, who concluded that Iskow could walk for two hours in an eight-hour workday. (Tr. 21-22, 74-76). Furthermore, Iskow's testimony regarding his activities of daily living, including swimming, attending church, and grocery shopping (Tr. 51, 234-35), was inconsistent with his asserted inability to walk more than thirty yards (Tr. 236). While Iskow notes that he sometimes requires a cane, the ALJ's RFC specifically provides for use of a cane, and Iskow has not demonstrated why this restriction insufficiently compensates for his use of a cane. (Doc. 9 at 20; Tr. 19). Iskow has failed to demonstrate that he is incapable of walking to the degree necessary to complete the jobs identified by the VE, and no remandable error can be found on this point.

Finally, if Iskow wished to challenge the amount of walking entailed by these three positions, he should have addressed that question to the VE at the hearing before the

25

ALJ. *See Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (finding waived an argument regarding the exclusion of third-party testimony because the claimant failed to raise that claim before the ALJ or Appeals Council); *Spuhler v. Colvin*, No. 2:13-CV-12272, 2014 WL 4855743, at *22 (E.D. Mich. June 17, 2014) (collecting cases discussing waiver where arguments were not raised at the hearing before the ALJ or at any administrative step), report and recommendation adopted in part, No. 2:13-CV-12272, 2014 WL 4856153 (E.D. Mich. Sept. 30, 2014). By sparing his argument until this judicial appeal, Iskow deprived the ALJ and the VE (and thus the Commissioner) of the opportunity to explain the precise degree to which the jobs identified by the VE require walking; *see also Blais v. Comm'r of Soc. Sec.*, No. 1:15-CV-0450, 2016 WL 1444348, at *7 (W.D. Mich. Apr. 13, 2016) (citing *Spurler* with approval); *Waitman v. Comm'r of Soc. Sec.*, No. 1:14-CV-162, 2015 WL 1477992, at *7 (W.D. Mich. Mar. 31, 2015) (same). Iskow's argument regarding the amount of walking restrictions thus may be not only deficient, but waived.

### 2. The ALJ's Finding that Iskow Can Lift More Than Ten Pounds is Not Well Supported

Iskow also argues that the RFC underestimates his degree of limitation because it wrongly provides that he can lift twenty pounds occasionally and ten pounds frequently. (Doc. 9 at 20). He notes that reviewing agency physician Dr. Dale Blum[1] concluded

---

[1] Iskow conflates the findings of Dr. Blum with Dr. Newhouse. (Doc. 9 at 21). This mistake is somewhat understandable, as both physicians' names appear on the Commissioner's disability determination

Iskow could lift no more than ten pounds occasionally and less than ten pounds frequently, and could perform unskilled sedentary work. (Tr. 74-75, 80). The ALJ gave "only partial weight" to this assessment, concluding that "the expanded record, particularly objective findings, are persuasive in limiting the claimant to a range of light work." (Tr. 22). Inconsistency with other evidence of record is one of the primary reasons to discount the weight given to a physician's opinion, and is specifically provided for by statute. *See* 20 C.F.R. § 404.1527(d)(2).

Iskow also notes that the ALJ gave little weight to the opinion of physician assistant Kim Dinock, because she lacked "program knowledge," because "she is not an acceptable medical source," and because "the opinion is not consistent with the medical evidence of record." (*Id*.). An opinion from a non-acceptable source must be considered, but the ALJ is not obliged to give "good reasons" for the weight accorded to that opinion. *See Darling v. Comm'r of Soc. Sec.*, No. 14-14043, 2015 WL 5877828, at *9 (E.D. Mich. Oct. 8, 2015).

Likewise, the ALJ gave "limited weight" to the opinion of Dr. Joanna Kala, who concluded that Iskow could lift no more than ten pounds, because Dr. Kala's opinions "are extreme and inconsistent with other medical records." (Tr. 22, 1058). The ALJ noted that Dr. Kala's recommendation that Iskow elevate his legs to chest level was

---

explanation sheet, though the former physician addressed physical issues, and the latter mental issues. (Tr. 73, 76). Consistent with the record, undersigned will reference the findings of Dr. Blum in addressing Iskow's arguments regarding lifting capacity.

unsupported by other records, that her diagnosis of fibromyalgia was not a "definitive or proper diagnosis of such," that her opinion on Iskow's ability to sit was more severe than his own estimated ability, and that she did not conclude that Iskow needed to lie down during the day, contradicting Iskow's claim that he did require that relief. (Tr. 22).

Determining whether a claimant is disabled is a question reserved solely to the Commissioner. *See* 20 C.F.R. § 404.1527(d). To require the ALJ to cobble together an RFC assessment solely from pieces of physicians' opinions would be to effectively relinquish analysis of disability to those physicians. *See* Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'") (quoting  SSR 96–5p). All the ALJ must do is craft a RFC finding which fully incorporates the claimant's supportable limitations. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (holding that the ALJ "is required to incorporate only those limitations accepted as credible by the finder of fact"). As always, the ALJ must present "good reasons" for the weight attached to the opinions of treating physicians in the record, *see* 20 C.F.R. § 404.1527(c)(2), and his or her final decision must be supported by substantial evidence, *see Sullivan*, 595 F. App'x at 506. Therefore, the ALJ was empowered to reject the weightlifting-capacity findings of

the physicians in the record, but only if he provided "good reasons" for the weight accorded to those opinions, and only if the RFC accurately portrays Iskow's ability to lift weight.

As to Dr. Blum's opinion, the ALJ concluded that it was entitled to little weight because "the expanded record, particularly objective findings, are persuasive in limiting the claimant to a range of light work." (Tr. 22). Looking to the ALJ's description of Iskow's medical records, he notes that the claimant experienced degenerative disc disease throughout his spine, but finds that those changes were "mild to moderate." (Tr. 21). He further notes the use of conservative treatment, including medication, injections, and physical therapy. (*Id*.). He also notes that Iskow reported complete pain relief in December 2013, did not return for pain management until March 2014, and a surgeon concluded that Iskow's claimed symptoms did not match objective findings. (*Id*.). He also cites Iskow's own testimony that he was able to lift a gallon of milk, which is around 8.6 pounds, and asserts that Iskow admitted he could lift "a case of soda or water at the grocery store." (Tr. 20-21).

The ALJ also cites Iskow's own testimony regarding his lifting ability as evidence that he can lift more than ten pounds. Yet it is not clear that Iskow's testimony on lifting provides any support to the ALJ's conclusion. At the hearing, Iskow testified that he could lift only about four pounds, but upon questioning admitted that he could lift a gallon of milk. (Tr. 43). While this inconsistency might be viewed as harmful to Iskow's

29

credibility, Iskow's candidness with the ALJ regarding his ability to lift a gallon of milk suggests that he is simply a poor judge of weight rather than a prevaricator. The ALJ also asserts that Iskow admitted he "is able to lift a case of soda or water at the grocery store" (Tr. 21), yet the record does not support that interpretation. In reality, the ALJ did not ask whether Iskow could lift a "case" of soda or water, but rather asked if he could lift "a thing of soda . . . or a water or something like that." (Tr. 44). Water and soda both come packaged in containers ranging from a few ounces to several gallons, and the record does not permit the reader to deduce of which sort of container the ALJ was referencing. The ALJ's finding that Iskow could lift a "case" of water or soda is thus a misrepresentation of the record, and cannot be used to support his decision. Furthermore, turning to Iskow's function report, he asserted that he has difficulty lifting laundry detergent "or cases of bottles or cans," suggesting that he would be unable to pick up a case of soda. (Tr. 236). Iskow's testimony thus does not contradict his asserted ten-pound-lifting-capacity, but rather tends to confirm it.

Iskow complains that the ALJ's reference to Dr. Kala's diagnosis of fibromyalgia and finding that Iskow needed to elevate his legs to chest height are "red herrings" which distract from the issue of whether he can perform the activities listed in the ALJ's RFC. (Doc. 9 at 25). An ALJ may of course discount portions of a physician's opinion insofar as those particular findings are not supported by other evidence of record. *See Zarate v. Comm'r of Soc. Sec.*, No. 10-CV-10020, 2011 WL 768059, at *6 (E.D. Mich. Jan. 13,

2011) ("An ALJ does not err in 'discounting the inconsistent and unsupported portions of" the treating physician's medical source statement.'") (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)), report and recommendation adopted, No. 10-10020, 2011 WL 767312 (E.D. Mich. Feb. 28, 2011). However, the fact that some portions of a physician's opinion are unsupported by the record is not a sufficient reason to discard the opinion altogether. This Court held in *Gallagher v. Comm'r of Soc. Sec.*, No. 10-CV-12498, 2011 WL 3841632, at *12 (E.D. Mich. Mar. 29, 2011), report and recommendation adopted, No. 10-12498, 2011 WL 3841629 (E.D. Mich. Aug. 30, 2011) that an ALJ's failure to discuss a physician's opinion was not harmless merely because some portions of that opinion were unsupported by the record, because other portions of the opinion were consistent with the record and thus merited consideration. Likewise, in *Stokes v. Comm'r of Soc. Sec.*, No. 09-CV-12722, 2010 WL 4063886, at *10 (E.D. Mich. July 23, 2010), report and recommendation adopted, No. 09-12722, 2010 WL 4063744 (E.D. Mich. Oct. 14, 2010) the Court found that a physician whose opinion incorrectly asserted that the patient did not suffer from alcohol abuse was not so patently deficient that the opinion as a whole could be scrapped based on that single flaw.

In this case, while the record does not support Dr. Kala's finding that Iskow should elevate his legs to chest level, this inconsistency merits only scrapping that particular finding, not Dr. Kala's opinion as a whole. Likewise, while Dr. Kala found that Iskow could sit for only one hour, while Iskow himself attested that he could sit for two,

31

this inconsistency again does not merit discarding Dr. Kala's opinion insofar as it is consistent with the medical evidence of record. As to Dr. Kala's diagnosis of fibromyalgia, it is not clear that her opinion is inconsistent with the record at all. She noted symptoms which were indicative of that disorder, recommended further testing, and placed Iskow on a medication regimen which provided him with relief from his fibromyalgia-like symptoms. That the record does not contain a formal diagnosis of fibromyalgia thus demonstrates no inconsistency.

I next turn to whether Dr. Kala's opinion is consistent with the record as a whole. Dr. Kala's opinion is merely a check-the-box form, which offers no detail on why she concluded Iskow was unable to lift more than ten pounds, why he would need to elevate his legs, nor why she diagnosed fibromyalgia. (Tr. 1057). It has been consistently held that check-the-box forms offer little support for the physician's conclusions, and may be given less weight on that basis. *See Hernandez v. Comm'r of Soc. Sec.*, No. 15-1875, 2016 WL 1055828, at *4 (6th Cir. Mar. 17, 2016) ("We have previously declined to give significant weight to rudimentary indications that lack an accompanying explanation."); *Ahee v. Comm'r of Soc. Sec.*, No. 07–CV–12071, 2008 WL 4377652, at *4 (E.D. Mich. Sept. 22, 2008) ("The ALJ has discretion to reject a medical opinion, here a form, when the opinion is not supported by objective medical evidence."). However, Dr. Kala's opinion is well supported by her treatment notes.

32

In July 2013 Dr. Kala noted abnormal EMG results in the lower extremities secondary to radiculopathy in the lumbar and the lumbosacral joint, along with occipital neuralgia and pain in the cervical and lumbosacral spine. (Tr. 988). Iskow's gait was "essentially normal," but with a slight limp in the left lower extremity. (Tr. 987). In September 2013 Dr. Kala noted normal strength in all extremities. (Tr. 946). December 2013 Dr. Kala determined that an EMG study of Iskow's upper extremities revealed bilateral median mononeuropathy at the wrist without cervical radiculopathy, along with diffuse myofascial pain in the upper and lower extremities, which she suspected indicated fibromyalgia. (Tr. 1051). Dr. Kala suggested further testing to confirm this suspicion. (*Id.*). In November 2013 Iskow told Dr. Kala of paresthesia of the upper extremities. (Tr. 1032). Findings by other physicians confirms the existence of disc degeneration, mild facet arthropathy, minimal spinal stenosis, annular bulge, and bilateral neural foraminal stenosis (Tr. 1013), along with a small central disc protrusion causing minimal stenosis (Tr. 1010), and joint weakness, muscular pain, and muscle weakness.

In May 2013 Dr. Mark Jones, the surgeon who considered Iskow's back issues stated that he was "not sure of the exact etiology" of Iskow's low back pain, and he "ordered an EMG" as a potential means of diagnosing that pain. (Tr. 530). In the following visit in November 2013 Dr. Jones notes that the EMG study demonstrated "increased potentials at L4, L5, and S1 on the left side," tending to confirm rather than discredit Iskow's complaints of lumbar pain. (Tr. 527).  Dr. Jones did not recommend

surgery. (Tr. 532). Dr. Jones likewise noted that Iskow was exercising using "some of [sic] machines" and swimming; he recommended that Iskow use a bicycle or treadmill for further cardiovascular exercise. (Tr. 527). Further, he noted that Iskow was working part-time, was "very active in the community," was walking without difficulty, and had full strength in both legs. (*Id*.). In March 2013 he noted that Iskow was still swimming and walking, and had no upper extremity issues. (Tr. 525).

It is undisputed that Iskow suffered from and was treated for disorders of the spine, nerves, arms, and back muscles, and that these disorders might reasonably limit his ability to lift weight to some degree. All physicians who rendered an opinion in the record, including the Commissioner's own non-examining reviewing physician, agree that Iskow ought not lift more than ten pounds. No medical opinion in the record supports a finding that Iskow can lift a weight greater than ten pounds. At no point in the record does Iskow admit to performing activities which entail him lifting greater than ten pounds. The ALJ may not substitute her own medical judgment for that of a physician, and is not permitted to render medical findings. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009); *Meece v. Barnhart*, 192 Fed. Appx. 456, 465 (6th Cir. 2006) ("[The ALJ] may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence."). In this case, there is simply no evidence, whether in the form of medical opinions, treatment notes, or testimony that Iskow could lift weight greater than ten

34

pounds. The Court must therefore conclude that the ALJ determined that Iskow could lift weights up to twenty pounds based on her own independent medical evaluation of the evidence. The ALJ could have ordered Iskow to submit to a consultative examination to determine his capacity to lift weights greater than ten pounds, *see* 20 C.F.R. § 404.1519a, but she chose not to do so. Because the ALJ's lifting capacity determination lacks any support in the record whatsoever, the ALJ's decision is not supported by substantial evidence, and should be remanded. *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (remanding where the ALJ rendered an independent medical judgment that the claimant's conditions could not cause the symptoms recorded by the claimant's physician).

### 3. The ALJ's RFC Adequately Accounts for Iskow's Mental Impairments

Iskow also argues that the ALJ's RFC assessment insufficiently compensates for his mental ailments. Specifically, Iskow asserts that he is unable to "interact a 1/3 of a workday with the general public and co-workers" as provided for in the ALJ's RFC. (Doc. 9 at 23; Tr. 19). Iskow urges that the findings of Dr. Newhouse, the Commissioner's non-examining physician, accurately represent his mental condition. Iskow points to Dr. Newhouse's conclusion he suffered from moderate limitations in numerous areas of mental functioning:

> Carrying out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within ordinary tolerances; work in

coordination with or in proximity to others without being distracted by them; to work as a consistent pace without an unreasonable number and length of rest periods; interact with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

(Doc. 9 at 22; Tr. 77-78).[2] The ALJ compensated for these limitations by restricting Iskow's RFC to performing "simple routine tasks without strict production demands" and "occasional interaction with coworkers and the general public." (Tr. 19). The ALJ fully adopted Dr. Newhouse's findings. (Tr. 18-19) ("[T]he undersigned accepts the opinions and supporting rationale of state agency physician Dr. Newhouse . . . ."). Likewise, Iskow

The relevant question is whether the ALJ's RFC finding adequately compensates for the limitations assessed by Dr. Newhouse. While it is true that Dr. Newhouse found Iskow would have difficulty working around others and on complex tasks, he also concluded that Iskow's alleged agoraphobia was "not well supported as he is active in church and had no problems with last job as cashier," that he would "function best in small familiar groups," and that he "retain[ed] the ability to do simple tasks on a sustained basis." (Tr. 78).

Iskow argues that a limitation to "unskilled" work and "simple, routine tasks" insufficiently compensates for moderate concentration, persistence, or pace ("CPP") limitations; this argument is frequently raised and "case law resolves it both ways."

---

[2] Iskow asserts that Dr. Brogan confirmed these findings. (Doc. 9 at 27). He also cites various treatment notes throughout the record (*Id*. at 4-6), but does not argue that any limitations should have been assessed beyond those proposed by Dr. Newhouse. Iskow thus appears to argue that the limitations proposed by Dr. Newhouse fully encompass his mental limitations.

*Hernandez v. Comm'r of Soc. Sec.*, No. 10–cv–14364, 2011 WL 4407225, at \*9 (E.D. Mich. Aug. 30, 2011). In some cases courts will remand when an ALJ's "hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks," but "other cases have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation." *Taylor v. Commissioner of Soc. Sec.,* No. 10–CV–12519, 2011 WL 2682682, at \*7 (E.D. Mich. May 17, 2011), Report & Recommendation adopted, No. 10–12519, 2011 WL 2682892 (E.D. Mich. July 11, 2011). "[T]here is no bright-line rule requiring remand" in these circumstances. *Roberts v. Comm'r of Soc. Sec.,* No. 10–cv–14064, at \*8 (E.D. Mich. Aug. 8, 2011), *Report & Recommendation adopted by* 2011 WL 4406344, at \*1 (E.D. Mich. Sept. 22, 2011). Instead, "this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Id*.

In this case, while Iskow regularly demonstrated difficulty concentrating (Tr. 178, 385 415, 1045, 1052, 1058), he also admitted to performing numerous activities that require substantial concentration, including writing and reading poetry (Tr. 235), attending church for several hours at a time (Tr. 45), writing and listening to music (Tr. 235), visiting the library (*Id*.), and browsing the web (Tr. 231-32). While he sometimes had difficulty maintaining his attention at church (Tr. 45), he attested that his primary mental problem was getting along with others, not maintaining concentration (Tr. 230).

37

Likewise, Iskow asserted at the hearing that he could no longer work as a car salesman or collections agent because of stress and physical limitations, not concentration difficulties. (Tr. 47-48). He quit sales work because of "panic attacks and anxiety." (Tr. 48). While these conditions might conceivably relate to the ability to concentrate, Iskow testified that his concentration problems were the result of pain, not panic or anxiety issues. (Tr. 45, 237). In short, while Iskow certainly experiences some problems concentrating, the ALJ reasonably adopted the findings of Dr. Newhouse, who concluded that Iskow retained the ability to perform simple, routine tasks without strict production demands. Particularly where Iskow himself appears to fully accept Dr. Newhouse's findings, I cannot find that the ALJ erred in failing to adopt more stringent CPP restrictions.

As to his ability to interact with others, Dr. Newhouse concluded that Iskow was "moderately limited" in his ability to work in coordination with or in proximity to others without being distracted by them; interact with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Yet he also noted that Iskow was able to work as a cashier, and attended church regularly without difficulty associating with others. (Tr. 78). Furthermore, Iskow did not allege that he had any difficulties interacting with others when shopping, visiting the library, or performing any other task that entails contact with the public. (Tr. 235). He expressed difficulty getting along with persons in positions of authority (Tr. 236), and had some stress problems

38

dealing with quotas and customers (Tr. 47), but said little regarding his ability to get along with coworkers or the public in a non-work setting. Iskow has thus not demonstrated why he would be unable to sustain occasional contact with coworkers and the public. This is doubly true where Iskow urges that Dr. Newhouse's assessment is an accurate depiction of his mental condition, yet that physician found that Iskow could sustain work, and the ALJ fully incorporated Dr. Newhouse's proposed restrictions into his RFC finding.

Dr. Newhouse also found that Iskow was moderately limited in terms of his ability to perform activities within a schedule, maintain regular attendance, and be punctual within ordinary tolerances; and to work as a consistent pace without an unreasonable number and length of rest periods. (Tr. 77-78). Iskow repeatedly notes these findings, but does not develop an argument regarding how the ALJ's RFC insufficiently accounts for these limitations. "It is well-established that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)). Merely mentioning that moderate limitations were assessed by a physician does not establish that the ALJ failed to incorporate those limitations into his RFC. Iskow is not entitled to rely upon the Court to develop arguments on his behalf. Whatever arguments Iskow could have raised regarding these findings are therefore waived. Moreover, as noted above, it is unclear why Iskow believes

that the RFC is deficient given that both the ALJ and Iskow agree that Dr. Newhouse's opinion accurately represents his mental condition, and the ALJ fully incorporated that physician's findings into his RFC.

### 4.     Iskow's Arguments Regarding his Sleep Deficits Are Waived

Finally, Iskow argues that the ALJ "failed to consider the impact of Norman's pain and the poor sleep he experiences secondary to back pain, and night terrors, and his need to nap because of poor sleep and the side effects to his medication." (Doc. 9 at 23). He cites to his own testimony to support this need to nap during the daytime, but does not cite medical records corroborating the same. (*Id*. at 3). The ALJ concluded that this alleged limitation was not well-supported because Iskow "has not provided . . . information [regarding his need to nap] to his doctors." (Tr. 22). Again, Iskow is not entitled to rely upon the Court to craft a cogent, supported argument on his behalf. While Iskow may find it taxing to review a transcript which exceeds 1000 pages, he may not shift this burden upon the Court. *See Risak v. Comm'r of Soc. Sec.*, No. 12-CV-10185, 2013 WL 3213131, at *10 (E.D. Mich. June 26, 2013) ("Plaintiff fails to identify any medical records in support of her contention that her symptoms were disabling during the relevant time period. Plaintiff cannot simply make the claim that the ALJ erred in assessing her credibility and therefore, was not entitled to rely on the VE's testimony, while leaving it to the Court to scour the record to support this claim."); *Muschiana v. Comm'r of Soc. Sec.*, No. 11-12438, 2012 WL 4498821, at *5 (E.D. Mich. Aug. 20,

40

2012) ("[P]laintiff cannot simply make the claim that the ALJ erred in assessing his credibility and therefore, was not entitled to rely on the VE's testimony, while leaving it to the Court to scour the record to support this claim."), report and recommendation adopted, No. 11-12438, 2012 WL 4476653 (E.D. Mich. Sept. 26, 2012).

While review of the medical record reveals some support for Iskow's alleged sleep issues, including a November 2013 finding of "[e]xcessive daytime somnolence," sleep apnea, and nocturnal hypoxia (Tr. 917), Iskow has waived any argument on this point by wholly abandoning his duty to properly develop this claim and support it with relevant evidence in the record.

In sum, the ALJ's decision is not supported by substantial evidence insofar as he substituted his own medical judgment for that of physicians in the record. Having found no support for the ALJ's conclusion that Iskow can lift more than ten pounds, the undersigned finds that this matter should be remanded for further consideration under sentence four of 42 U.S.C. § 405(g). However, the ALJ did not err in assessing Iskow's ability to walk. Iskow has not established that the ALJ failed to accommodate his mental limitations, because all parties agree that Dr. Newhouse properly analyzed Iskow's limitations, and the ALJ incorporated those findings into the RFC. Finally, Iskow has abandoned any claims regarding the limitations imposed by his sleep issues by failing to support his bare allegations with reference to the medical record.

41

### H.  Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Iskow's Motion for Summary Judgment (Doc. 9) be **GRANTED**, the Commissioner's Motion (Doc. 13) be **DENIED**, and that this case be **REMANDED FOR FURTHER PROCEEDINGS** pursuant to sentence four of 42 U.S.C. § 405(g).

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Iskow v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 28, 2016             S/ PATRICIA T. MORRIS
                                     Patricia T. Morris
                                     United States Magistrate Judge


## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 28, 2016              By s/Kristen Castaneda
                                     Case Manager

43